(Slip Opinion)　　　OCTOBER TERM, 2016　　　1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MATAL, INTERIM DIRECTOR, UNITED STATES PATENT AND TRADEMARK OFFICE *v.* TAM

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

No. 15–1293.　Argued January 18, 2017—Decided June 19, 2017

Simon Tam, lead singer of the rock group "The Slants," chose this moniker in order to "reclaim" the term and drain its denigrating force as a derogatory term for Asian persons. Tam sought federal registration of the mark "THE SLANTS." The Patent and Trademark Office (PTO) denied the application under a Lanham Act provision prohibiting the registration of trademarks that may "disparage . . . or bring . . . into contemp[t] or disrepute" any "persons, living or dead." 15 U. S. C. §1052(a). Tam contested the denial of registration through the administrative appeals process, to no avail. He then took the case to federal court, where the en banc Federal Circuit ultimately found the disparagement clause facially unconstitutional under the First Amendment's Free Speech Clause.

*Held*: The judgment is affirmed.

808 F. 3d 1321, affirmed.

　　JUSTICE ALITO delivered the opinion of the Court with respect to Parts I, II, and III–A, concluding:

　　1. The disparagement clause applies to marks that disparage the members of a racial or ethnic group. Tam's view, that the clause applies only to natural or juristic persons, is refuted by the plain terms of the clause, which uses the word "persons." A mark that disparages a "substantial" percentage of the members of a racial or ethnic group necessarily disparages many "persons," namely, members of that group. Tam's narrow reading also clashes with the breadth of the disparagement clause, which by its terms applies not just to "persons," but also to "institutions" and "beliefs." §1052(a). Had Congress wanted to confine the reach of the clause, it could have used the

phrase "particular living individual," which it used in neighboring §1052(c).  Tam contends that his interpretation is supported by legislative history and by the PTO's practice for many years of registering marks that plainly denigrated certain groups.  But an inquiry into the meaning of the statute's text ceases when, as here, "the statutory language is unambiguous and the statutory scheme is coherent and consistent."  *Barnhart* v. *Sigmon Coal Co.*, 534 U. S. 438, 450 (internal quotation marks omitted).  Even if resort to legislative history and early enforcement practice were appropriate, Tam has presented nothing showing a congressional intent to adopt his interpretation, and the PTO's practice in the years following the disparagement clause's enactment is unenlightening.  Pp. 8–12.

2. The disparagement clause violates the First Amendment's Free Speech Clause.  Contrary to the Government's contention, trademarks are private, not government speech.  Because the "Free Speech Clause . . . does not regulate government speech," *Pleasant Grove City* v. *Summum*, 555 U. S. 460, 467, the government is not required to maintain viewpoint neutrality on its own speech.  This Court exercises great caution in extending its government-speech precedents, for if private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints.

The Federal Government does not dream up the trademarks registered by the PTO.  Except as required by §1052(a), an examiner may not reject a mark based on the viewpoint that it appears to express.  If the mark meets the Lanham Act's viewpoint-neutral requirements, registration is mandatory.  And once a mark is registered, the PTO is not authorized to remove it from the register unless a party moves for cancellation, the registration expires, or the Federal Trade Commission initiates proceedings based on certain grounds.  It is thus farfetched to suggest that the content of a registered mark is government speech, especially given the fact that if trademarks become government speech when they are registered, the Federal Government is babbling prodigiously and incoherently.  And none of this Court's government-speech cases supports the idea that registered trademarks are government speech.  *Johanns* v. *Livestock Marketing Assn.*, 544 U. S. 550; *Pleasant Grove City* v. *Summum*, 555 U. S. 460; and *Walker* v. *Texas Div., Sons of Confederate Veterans, Inc.*, 576 U. S. ___, distinguished.  Holding that the registration of a trademark converts the mark into government speech would constitute a huge and dangerous extension of the government-speech doctrine, for other systems of government registration (such as copyright) could easily be characterized in the same way.  Pp. 12–18.

JUSTICE ALITO, joined by THE CHIEF JUSTICE, JUSTICE THOMAS, and

Syllabus

JUSTICE BREYER, concluded in Parts III–B, III–C, and IV:

(a) The Government's argument that this case is governed by the Court's subsidized-speech cases is unpersuasive. Those cases all involved cash subsidies or their equivalent, *e.g.*, funds to private parties for family planning services in *Rust* v. *Sullivan*, 500 U. S. 173, and cash grants to artists in *National Endowment for Arts* v. *Finley*, 524 U. S. 569. The federal registration of a trademark is nothing like these programs. The PTO does not pay money to parties seeking registration of a mark; it requires the payment of fees to file an application and to maintain the registration once it is granted. The Government responds that registration provides valuable non-monetary benefits traceable to the Government's resources devoted to registering the marks, but nearly every government service requires the expenditure of government funds. This is true of services that benefit everyone, like police and fire protection, as well as services that are utilized by only some, *e.g.*, the adjudication of private lawsuits and the use of public parks and highways. Pp. 18–20.

(b) Also unpersuasive is the Government's claim that the disparagement clause is constitutional under a "government-program" doctrine, an argument which is based on a merger of this Court's government-speech cases and subsidy cases. It points to two cases involving a public employer's collection of union dues from its employees, *Davenport* v. *Washington Ed. Assn.*, 551 U. S. 177, and *Ysursa* v. *Pocatello Ed. Assn.*, 555 U. S. 353, but these cases occupy a special area of First Amendment case law that is far removed from the registration of trademarks. Cases in which government creates a limited public forum for private speech, thus allowing for some content- and speaker-based restrictions, see, *e.g.*, *Good News Club* v. *Milford Central School*, 533 U. S. 98, 106–107; *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 831, are potentially more analogous. But even in those cases, viewpoint discrimination is forbidden. The disparagement clause denies registration to any mark that is offensive to a substantial percentage of the members of any group. That is viewpoint discrimination in the sense relevant here: Giving offense is a viewpoint. The "public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Street* v. *New York*, 394 U. S. 576, 592. Pp. 20–23.

(c) The dispute between the parties over whether trademarks are commercial speech subject to the relaxed scrutiny outlined in *Central Hudson Gas & Elect.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557, need not be resolved here because the disparagement clause cannot withstand even *Central Hudson* review. Under *Central Hudson*, a restriction of speech must serve "a substantial interest" and be "nar-

rowly drawn."  *Id.*, at 564–565 (internal quotation marks omitted).
One purported interest is in preventing speech expressing ideas that
offend, but that idea strikes at the heart of the First Amendment.
The second interest asserted is protecting the orderly flow of com-
merce from disruption caused by trademarks that support invidious
discrimination; but the clause, which reaches any trademark that
disparages *any person, group, or institution*, is not narrowly drawn.
Pp. 23–26.

   JUSTICE KENNEDY, joined by JUSTICE GINSBURG, JUSTICE SO-
TOMAYOR, and JUSTICE KAGAN, agreed that 15 U. S. C. §1052(a) con-
stitutes viewpoint discrimination, concluding:

   (a) With few narrow exceptions, a fundamental principle of the
First Amendment is that the government may not punish or suppress
speech based on disapproval of the ideas or perspectives the speech
conveys.  See *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515
U. S. 819, 828–829.  The test for viewpoint discrimination is wheth-
er—within the relevant subject category—the government has sin-
gled out a subset of messages for disfavor based on the views ex-
pressed.   Here, the disparagement clause identifies the relevant
subject as "persons, living or dead, institutions, beliefs, or national
symbols," §1052(a); and within that category, an applicant may regis-
ter a positive or benign mark but not a derogatory one.  The law thus
reflects the Government's disapproval of a subset of messages it finds
offensive, the essence of viewpoint discrimination.  The Government's
arguments in defense of the statute are unpersuasive.  Pp. 2–5.

   (b) Regardless of whether trademarks are commercial speech, the
viewpoint based discrimination here necessarily invokes heightened
scrutiny.  See *Sorrell* v. *IMS Health Inc.*, 564 U. S. 552, 566.  To the
extent trademarks qualify as commercial speech, they are an exam-
ple of why that category does not serve as a blanket exemption from
the First Amendment's requirement of viewpoint neutrality.  In the
realm of trademarks, the metaphorical marketplace of ideas becomes
a tangible, powerful reality.  To permit viewpoint discrimination in
this context is to permit Government censorship.  Pp. 5–7.

   ALITO, J., announced the judgment of the Court and delivered the
opinion of the Court with respect to Parts I, II, and III–A, in which
ROBERTS, C. J., and KENNEDY, GINSBURG, BREYER, SOTOMAYOR, and
KAGAN, JJ., joined, and in which THOMAS, J., joined except for Part II,
and an opinion with respect to Parts III–B, III–C, and IV, in which
ROBERTS, C. J., and THOMAS and BREYER, JJ., joined.  KENNEDY, J., filed
an opinion concurring in part and concurring in the judgment, in which
GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined.  THOMAS, J., filed an
opinion concurring in part and concurring in the judgment.  GORSUCH,
J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–1293

_____

## JOSEPH MATAL, INTERIM DIRECTOR, UNITED STATES PATENT AND TRADEMARK OFFICE, PETITIONER *v.* SIMON SHIAO TAM

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

[June 19, 2017]

JUSTICE ALITO announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, and III–A, and an opinion with respect to Parts III–B, III–C, and IV, in which THE CHIEF JUSTICE, JUSTICE THOMAS, and JUSTICE BREYER join.

This case concerns a dance-rock band's application for federal trademark registration of the band's name, "The Slants." "Slants" is a derogatory term for persons of Asian descent, and members of the band are Asian-Americans. But the band members believe that by taking that slur as the name of their group, they will help to "reclaim" the term and drain its denigrating force.

The Patent and Trademark Office (PTO) denied the application based on a provision of federal law prohibiting the registration of trademarks that may "disparage . . . or bring . . . into contemp[t] or disrepute" any "persons, living or dead." 15 U. S. C. §1052(a). We now hold that this provision violates the Free Speech Clause of the First Amendment. It offends a bedrock First Amendment principle: Speech may not be banned on the ground that it

expresses ideas that offend.

## I
## A

"The principle underlying trademark protection is that distinctive marks—words, names, symbols, and the like—can help distinguish a particular artisan's goods from those of others." *B&B Hardware, Inc.* v. *Hargis Industries, Inc.*, 575 U. S. ___, ___ (2015) (slip op., at 3); see also *Wal-Mart Stores, Inc.* v. *Samara Brothers, Inc.*, 529 U. S. 205, 212 (2000). A trademark "designate[s] the goods as the product of a particular trader" and "protect[s] his good will against the sale of another's product as his." *United Drug Co.* v. *Theodore Rectanus Co.*, 248 U. S. 90, 97 (1918); see also *Hanover Star Milling Co.* v. *Metcalf*, 240 U. S. 403, 412–413 (1916). It helps consumers identify goods and services that they wish to purchase, as well as those they want to avoid. See *Wal-Mart Stores*, *supra*, at 212–213; *Park 'N Fly, Inc.* v. *Dollar Park & Fly, Inc.*, 469 U. S. 189, 198 (1985).

"[F]ederal law does not create trademarks." *B&B Hardware*, *supra*, at ___ (slip op., at 3). Trademarks and their precursors have ancient origins, and trademarks were protected at common law and in equity at the time of the founding of our country. 3 J. McCarthy, Trademarks and Unfair Competition §19:8 (4th ed. 2017) (hereinafter McCarthy); 1 *id.*, §§5:1, 5:2, 5:3; Pattishal, The Constitutional Foundations of American Trademark Law, 78 Trademark Rep. 456, 457–458 (1988); Pattishall, Two Hundred Years of American Trademark Law, 68 Trademark Rep. 121, 121–123 (1978); see *Trade-Mark Cases*, 100 U. S. 82, 92 (1879). For most of the 19th century, trademark protection was the province of the States. See *Two Pesos, Inc.* v. *Taco Cabana, Inc.*, 505 U. S. 763, 780–782 (1992) (Stevens, J., concurring in judgment); *id.*, at 785 (THOMAS, J., concurring in judgment). Eventually,

Congress stepped in to provide a degree of national uni-formity, passing the first federal legislation protecting trademarks in 1870. See Act of July 8, 1870, §§77–84, 16 Stat. 210–212. The foundation of current federal trade-mark law is the Lanham Act, enacted in 1946. See Act of July 5, 1946, ch. 540, 60 Stat. 427. By that time, trade-mark had expanded far beyond phrases that do no more than identify a good or service. Then, as now, trademarks often consisted of catchy phrases that convey a message.

Under the Lanham Act, trademarks that are "used in commerce" may be placed on the "principal register," that is, they may be federally registered. 15 U. S. C. §1051(a)(1). And some marks "capable of distinguishing [an] applicant's goods or services and not registrable on the principal register . . . which are in lawful use in com-merce by the owner thereof" may instead be placed on a different federal register: the supplemental register. §1091(a). There are now more than two million marks that have active federal certificates of registration. PTO Performance and Accountability Report, Fiscal Year 2016, p. 192 (Table 15), https://www.uspto.gov/sites/default/files/ documents/USPTOFY16PAR.pdf (all Internet materials as last visited June 16, 2017). This system of federal regis-tration helps to ensure that trademarks are fully protected and supports the free flow of commerce. "[N]ational pro-tection of trademarks is desirable," we have explained, "because trademarks foster competition and the mainte-nance of quality by securing to the producer the benefits of good reputation." *San Francisco Arts & Athletics, Inc.* v. *United States Olympic Comm.*, 483 U. S. 522, 531 (1987) (internal quotation marks omitted); see also *Park 'N Fly, Inc.*, *supra*, at 198 ("The Lanham Act provides national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers").

B

Without federal registration, a valid trademark may still be used in commerce. See 3 McCarthy §19:8. And an unregistered trademark can be enforced against would-be infringers in several ways. Most important, even if a trademark is not federally registered, it may still be enforceable under §43(a) of the Lanham Act, which creates a federal cause of action for trademark infringement. See *Two Pesos*, *supra*, at 768 ("Section 43(a) prohibits a broader range of practices than does §32, which applies to registered marks, but it is common ground that §43(a) protects qualifying unregistered trademarks" (internal quotation marks and citation omitted)).[1] Unregistered trademarks may also be entitled to protection under other federal statutes, such as the Anticybersquatting Consumer Protection Act, 15 U. S. C. §1125(d). See 5 McCarthy §25A:49, at 25A–198 ("[T]here is no requirement [in the Anticybersquatting Act] that the protected 'mark' be registered: unregistered common law marks are protected by the Act"). And an unregistered trademark can be enforced under state common law, or if it has been registered in a State, under that State's registration system. See 3 *id.*, §19:3, at 19–23 (explaining that "[t]he federal system of registration and protection does not preempt parallel state

—————

[1] In the opinion below, the Federal Circuit opined that although "Section 43(a) allows for a federal suit to protect an unregistered trademark," "it is not at all clear" that respondent could bring suit under §43(a) because "there is no authority extending §43(a) to marks denied under §2(a)'s disparagement provision." *In re Tam*, 808 F. 3d 1321, 1344–1345, n.11 (en banc), as corrected (Feb. 11, 2016). When drawing this conclusion, the Federal Circuit relied in part on our statement in *Two Pesos* that "the general principles qualifying a mark for registration under §2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under §43(a)." 505 U. S., at 768. We need not decide today whether respondent could bring suit under §43(a) if his application for federal registration had been lawfully denied under the disparagement clause.

law protection, either by state common law or state registration" and "[i]n the vast majority of situations, federal and state trademark law peacefully coexist"); *id.*, §22:1 (discussing state trademark registration systems).

Federal registration, however, "confers important legal rights and benefits on trademark owners who register their marks." *B&B Hardware*, 575 U. S., at \_\_\_ (slip op., at 3) (internal quotation marks omitted). Registration on the principal register (1) "serves as 'constructive notice of the registrant's claim of ownership' of the mark," *ibid.* (quoting 15 U. S. C. §1072); (2) "is 'prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate,'" *B & B Hardware*, 575 U. S. \_\_\_ (slip op., at 3) (quoting §1057(b)); and (3) can make a mark "'incontestable'" once a mark has been registered for five years," *ibid.* (quoting §§1065, 1115(b)); see *Park 'N Fly*, 469 U. S., at 193. Registration also enables the trademark holder "to stop the importation into the United States of articles bearing an infringing mark." 3 McCarthy §19:9, at 19–38; see 15 U. S. C. §1124.

### C

The Lanham Act contains provisions that bar certain trademarks from the principal register. For example, a trademark cannot be registered if it is "merely descriptive or deceptively misdescriptive" of goods, §1052(e)(1), or if it is so similar to an already registered trademark or trade name that it is "likely . . . to cause confusion, or to cause mistake, or to deceive," §1052(d).

At issue in this case is one such provision, which we will call "the disparagement clause." This provision prohibits the registration of a trademark "which may disparage . . . persons, living or dead, institutions, beliefs, or national symbols,

or bring them into contempt, or disrepute." §1052(a).[2] This clause appeared in the original Lanham Act and has remained the same to this day. See §2(a), 60 Stat. 428.

When deciding whether a trademark is disparaging, an examiner at the PTO generally applies a "two-part test." The examiner first considers "the likely meaning of the matter in question, taking into account not only dictionary definitions, but also the relationship of the matter to the other elements in the mark, the nature of the goods or services, and the manner in which the mark is used in the marketplace in connection with the goods or services." Trademark Manual of Examining Procedure §1203.03(b)(i) (Apr. 2017), p. 1200–150, http://tmep.uspto.gov. "If that meaning is found to refer to identifiable persons, institutions, beliefs or national symbols," the examiner moves to the second step, asking "whether that meaning may be disparaging to a substantial composite[3] of the referenced group." *Ibid.* If the examiner finds that a "substantial composite, although not necessarily a majority, of the referenced group would find the proposed mark . . . to be disparaging in the context of contemporary attitudes," a prima facie case of disparagement is made out, and the burden shifts to the applicant to prove that the trademark is not disparaging. *Ibid.* What is more, the PTO has specified that "[t]he fact that an applicant may be a member of that group or has good intentions underlying its use of a term does not obviate the fact that a substantial composite of the referenced group would find the term objectionable." *Ibid.*

## D

Simon Tam is the lead singer of "The Slants." *In re Tam*, 808 F. 3d 1321, 1331 (CA Fed. 2015) (en banc), as

---

[2] The disparagement clause also prevents a trademark from being registered on the supplemental register. §1091(a).

[3] By "composite," we assume the PTO means component.

corrected (Feb. 11, 2016). He chose this moniker in order to "reclaim" and "take ownership" of stereotypes about people of Asian ethnicity. *Ibid.* (internal quotation marks omitted). The group "draws inspiration for its lyrics from childhood slurs and mocking nursery rhymes" and has given its albums names such as "The Yellow Album" and "Slanted Eyes, Slanted Hearts." *Ibid.*

Tam sought federal registration of "THE SLANTS," on the principal register, App. 17, but an examining attorney at the PTO rejected the request, applying the PTO's two-part framework and finding that "there is . . . a substantial composite of persons who find the term in the applied-for mark offensive." *Id.*, at 30. The examining attorney relied in part on the fact that "numerous dictionaries define 'slants' or 'slant-eyes' as a derogatory or offensive term." *Id.*, at 29. The examining attorney also relied on a finding that "the band's name has been found offensive numerous times"—citing a performance that was canceled because of the band's moniker and the fact that "several bloggers and commenters to articles on the band have indicated that they find the term and the applied-for mark offensive." *Id.*, at 29–30.

Tam contested the denial of registration before the examining attorney and before the PTO's Trademark Trial and Appeal Board (TTAB) but to no avail. Eventually, he took the case to federal court, where the en banc Federal Circuit ultimately found the disparagement clause facially unconstitutional under the First Amendment's Free Speech Clause. The majority found that the clause engages in viewpoint-based discrimination, that the clause regulates the expressive component of trademarks and consequently cannot be treated as commercial speech, and that the clause is subject to and cannot satisfy strict scrutiny. See 808 F. 3d, at 1334–1339. The majority also rejected the Government's argument that registered trademarks constitute government speech, as well as the

Government's contention that federal registration is a form of government subsidy. See *id.*, at 1339–1355. And the majority opined that even if the disparagement clause were analyzed under this Court's commercial speech cases, the clause would fail the "intermediate scrutiny" that those cases prescribe. See *id.*, at 1355–1357.

Several judges wrote separately, advancing an assortment of theories. Concurring, Judge O'Malley agreed with the majority's reasoning but added that the disparagement clause is unconstitutionally vague. See *id.*, at 1358–1363. Judge Dyk concurred in part and dissented in part. He argued that trademark registration is a government subsidy and that the disparagement clause is facially constitutional, but he found the clause unconstitutional as applied to THE SLANTS because that mark constitutes "core expression" and was not adopted for the purpose of disparaging Asian-Americans. See *id.*, at 1363–1374. In dissent, Judge Lourie agreed with Judge Dyk that the clause is facially constitutional but concluded for a variety of reasons that it is also constitutional as applied in this case. See *id.*, at 1374–1376. Judge Reyna also dissented, maintaining that trademarks are commercial speech and that the disparagement clause survives intermediate scrutiny because it "directly advances the government's substantial interest in the orderly flow of commerce." See *id.*, at 1376–1382.

The Government filed a petition for certiorari, which we granted in order to decide whether the disparagement clause "is facially invalid under the Free Speech Clause of the First Amendment." Pet. for Cert. i; see *sub. nom. Lee* v. *Tam*, 579 U. S. ___ (2016).

## II

Before reaching the question whether the disparagement clause violates the First Amendment, we consider Tam's argument that the clause does not reach marks that

disparage racial or ethnic groups. The clause prohibits the registration of marks that disparage "persons," and Tam claims that the term "persons" "includes only natural and juristic persons," not "non-juristic entities such as racial and ethnic groups." Brief for Respondent 46.

Tam never raised this argument before the PTO or the Federal Circuit, and we declined to grant certiorari on this question when Tam asked us to do so, see Brief Responding to Petition for Certiorari, pp. i, 17–21. Normally, that would be the end of the matter in this Court. See, *e.g.*, *Yee* v. *Escondido,* 503 U. S. 519, 534–538 (1992); *Freytag* v. *Commissioner*, 501 U. S. 868, 894–895 (1991) (Scalia, J., concurring in part and concurring in judgment).

But as the Government pointed out in connection with its petition for certiorari, accepting Tam's statutory interpretation would resolve this case and leave the First Amendment question for another day. See Reply Brief 9. "[W]e have often stressed" that it is "importan[t] [to] avoid[d] the premature adjudication of constitutional questions," *Clinton* v. *Jones*, 520 U. S. 681, 690 (1997), and that "we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable," *Spector Motor Service, Inc.* v. *McLaughlin*, 323 U. S. 101, 105 (1944). See also *Alabama State Federation of Labor* v. *McAdory*, 325 U. S. 450, 461 (1945); *Burton* v. *United States*, 196 U. S. 283, 295 (1905). We thus begin by explaining why Tam's argument about the definition of "persons" in the Lanham Act is meritless.

As noted, the disparagement clause prohibits the registration of trademarks "which may disparage . . . persons, living or dead." 15 U. S. C. §1052(a). Tam points to a definition of "person" in the Lanham Act, which provides that "[i]n the construction of this chapter, unless the contrary is plainly apparent from the context . . . [t]he term 'person' and any other word or term used to designate the applicant or other entitled to a benefit or privi-

lege or rendered liable under the provisions of this chapter
includes a juristic person as well as a natural person."
§1127.   Because racial and ethnic groups are neither
natural nor "juristic" persons, Tam asserts, these groups
fall outside this definition.  Brief for Respondent 46–48.

Tam's argument is refuted by the plain terms of the
disparagement clause.  The clause applies to marks that
disparage "persons."  A mark that disparages a "substan-
tial" percentage of the members of a racial or ethnic group,
Trademark Manual §1203.03(b)(i), at 1200–150, necessar-
ily disparages many "persons," namely, members of that
group.  Tam's argument would fail even if the clause used
the singular term "person," but Congress' use of the plural
"persons" makes the point doubly clear.[4]

Tam's narrow reading of the term "persons" also clashes
with the breadth of the disparagement clause.  By its
terms, the clause applies to marks that disparage, not just
"persons," but also "institutions" and "beliefs."  15 U. S. C.
§1052(a).  It thus applies to the members of any group
whose members share particular "beliefs," such as politi-
cal, ideological, and religious groups.  It applies to marks
that denigrate "institutions," and on Tam's reading, it also
reaches "juristic" persons such as corporations, unions,
and other unincorporated associations.  See §1127.  Thus,
the clause is not limited to marks that disparage a partic-
ular natural person.  If Congress had wanted to confine

––––––––––

[4] Tam advances a convoluted textual argument that goes as follows.
The definition of a "person" in 15 U. S. C. §1127 does not include a
"non-juristic person," *i.e.*, a group that cannot sue or be sued in its own
right.  Brief for Respondent 46–47.  Such groups consist of multiple
natural persons.  Therefore, the members of such groups are not
"persons" under the disparagement clause.  *Id.*, at 46–48.

This argument leads to the absurd result that no person is a "person"
within the meaning of the disparagement clause.  This is so because
every person is a member of a "non-juristic" group, *e.g.*, right-handers,
left-handers, women, men, people born on odd-numbered days, people
born on even-numbered days.

the reach of the disparagement clause in the way that Tam suggests, it would have been easy to do so. A neighboring provision of the Lanham Act denies registration to any trademark that "[c]onsists of or comprises a name, portrait, or signature identifying a *particular living individual* except by his written consent." §1052(c) (emphasis added).

Tam contends that his interpretation of the disparagement clause is supported by its legislative history and by the PTO's willingness for many years to register marks that plainly denigrated African-Americans and Native Americans. These arguments are unpersuasive. As always, our inquiry into the meaning of the statute's text ceases when "the statutory language is unambiguous and the statutory scheme is coherent and consistent." *Barnhart* v. *Sigmon Coal Co.*, 534 U. S. 438, 450 (2002) (internal quotation marks omitted). Here, it is clear that the prohibition against registering trademarks "which may disparage . . . persons," §1052(a), prohibits registration of terms that disparage persons who share a common race or ethnicity.

Even if resort to legislative history and early enforcement practice were appropriate, we would find Tam's arguments unconvincing. Tam has not brought to our attention any evidence in the legislative history showing that Congress meant to adopt his interpretation. And the practice of the PTO in the years following the enactment of the disparagement clause is unenlightening. The admitted vagueness of the disparagement test[5] and the huge

---

[5] The PTO has acknowledged that the guidelines "for determining whether a mark is scandalous or disparaging are somewhat vague and the determination of whether a mark is scandalous or disparaging is necessarily a highly subjective one." *In re In Over Our Heads, Inc.*, 16 USPQ 2d 1653, 1654 (TTAB 1990) (brackets and internal quotation marks omitted). The PTO has similarly observed that whether a mark is disparaging "is highly subjective and, thus, general rules are difficult

volume of applications have produced a haphazard record of enforcement. (Even today, the principal register is replete with marks that many would regard as disparaging to racial and ethnic groups.[6]) Registration of the offensive marks that Tam cites is likely attributable not to the acceptance of his interpretation of the clause but to other factors—most likely the regrettable attitudes and sensibilities of the time in question.

## III

Because the disparagement clause applies to marks that disparage the members of a racial or ethnic group, we must decide whether the clause violates the Free Speech Clause of the First Amendment. And at the outset, we must consider three arguments that would either eliminate any First Amendment protection or result in highly permissive rational-basis review. Specifically, the Government contends (1) that trademarks are government speech, not private speech, (2) that trademarks are a form of government subsidy, and (3) that the constitutionality of the disparagement clause should be tested under a new "government-program" doctrine. We address each of these arguments below.

## A

The First Amendment prohibits Congress and other government entities and actors from "abridging the freedom of speech"; the First Amendment does not say that Congress and other government entities must abridge their own ability to speak freely. And our cases recognize that "[t]he Free Speech Clause . . . does not regulate government speech." *Pleasant Grove City* v. *Summum*, 555

─────────

to postulate." *Harjo* v. *Pro-Football Inc.*, 50 USPQ 2d 1705, 1737 (TTAB 1999), rev'd, 284 F. Supp. 2d 96 (DC 2003), rev'd and remanded in part, 415 F. 3d 44 (CADC 2005) (*per curiam*).

[6] See, *e.g.*, App. to Brief for Pro-Football, Inc., as *Amicus Curiae*.

U.S. 460, 467 (2009); see *Johanns* v. *Livestock Marketing Assn.*, 544 U.S. 550, 553 (2005) ("[T]he Government's own speech . . . is exempt from First Amendment scrutiny"); *Board of Regents of Univ. of Wis. System* v. *Southworth*, 529 U.S. 217, 235 (2000).

As we have said, "it is not easy to imagine how government could function" if it were subject to the restrictions that the First Amendment imposes on private speech. *Summum*, *supra*, at 468; see *Walker* v. *Texas Div., Sons of Confederate Veterans, Inc.*, 576 U. S. ___, ___–___ (2015) (slip op., at 5–7). "'[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others,'" *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384, 394 (1993), but imposing a requirement of viewpoint-neutrality on government speech would be paralyzing. When a government entity embarks on a course of action, it necessarily takes a particular viewpoint and rejects others. The Free Speech Clause does not require government to maintain viewpoint neutrality when its officers and employees speak about that venture.

Here is a simple example. During the Second World War, the Federal Government produced and distributed millions of posters to promote the war effort.[7] There were posters urging enlistment, the purchase of war bonds, and the conservation of scarce resources.[8] These posters expressed a viewpoint, but the First Amendment did not demand that the Government balance the message of these posters by producing and distributing posters encouraging Americans to refrain from engaging in these activities.

But while the government-speech doctrine is important—indeed, essential—it is a doctrine that is suscep-

_____

[7] See, *e.g.*, D. Nelson, The Posters That Won the War (1991).
[8] *Ibid.*

tible to dangerous misuse.  If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints.  For this reason, we must exercise great caution before extending our government-speech precedents.

At issue here is the content of trademarks that are registered by the PTO, an arm of the Federal Government. The Federal Government does not dream up these marks, and it does not edit marks submitted for registration. Except as required by the statute involved here, 15 U. S. C. §1052(a), an examiner may not reject a mark based on the viewpoint that it appears to express.  Thus, unless that section is thought to apply, an examiner does not inquire whether any viewpoint conveyed by a mark is consistent with Government policy or whether any such viewpoint is consistent with that expressed by other marks already on the principal register.  Instead, if the mark meets the Lanham Act's viewpoint-neutral requirements, registration is mandatory.  *Ibid.* (requiring that "[n]o trademark . . . shall be refused registration on the principal register on account of its nature unless" it falls within an enumerated statutory exception).  And if an examiner finds that a mark is eligible for placement on the principal register, that decision is not reviewed by any higher official unless the registration is challenged.  See §§1062(a), 1071; 37 CFR §41.31(a) (2016).  Moreover, once a mark is registered, the PTO is not authorized to remove it from the register unless a party moves for cancellation, the registration expires, or the Federal Trade Commission initiates proceedings based on certain grounds.  See 15 U. S. C. §§1058(a), 1059, 1064; 37 CFR §§2.111(b), 2.160.

In light of all this, it is far-fetched to suggest that the content of a registered mark is government speech.  If the federal registration of a trademark makes the mark government speech, the Federal Government is babbling

prodigiously and incoherently. It is saying many unseemly things. See App. to Brief for Pro-Football, Inc., as *Amicus Curiae*. It is expressing contradictory views.[9] It is unashamedly endorsing a vast array of commercial products and services. And it is providing Delphic advice to the consuming public.

For example, if trademarks represent government speech, what does the Government have in mind when it advises Americans to "make.believe" (Sony),[10] "Think different" (Apple),[11] "Just do it" (Nike),[12] or "Have it your way" (Burger King)[13]? Was the Government warning about a coming disaster when it registered the mark "EndTime Ministries"[14]?

The PTO has made it clear that registration does not constitute approval of a mark. See *In re Old Glory Condom Corp.*, 26 USPQ 2d 1216, 1220, n. 3 (TTAB 1993) ("[I]ssuance of a trademark registration . . . is not a government imprimatur"). And it is unlikely that more than a tiny fraction of the public has any idea what federal registration of a trademark means. See *Application of National Distillers & Chemical Corp.*, 49 C. C. P. A. (Pat.) 854, 863, 297 F. 2d 941, 949 (1962) (Rich, J., concurring) ("The purchasing public knows no more about trademark registrations than a man walking down the street in a

_____

[9] Compare "Abolish Abortion," Registration No. 4,935,774 (Apr. 12, 2016), with "I Stand With Planned Parenthood," Registration No. 5,073,573 (Nov. 1, 2016); compare "Capitalism Is Not Moral, Not Fair, Not Freedom," Registration No. 4,696,419 (Mar. 3, 2015), with "Capitalism Ensuring Innovation," Registration No. 3,966,092 (May 24, 2011); compare "Global Warming Is Good," Registration No. 4,776,235 (July 21, 2015), with "A Solution to Global Warming," Registration No. 3,875,271 (Nov. 10, 2010).

[10] "make.believe," Registration No. 4,342,903 (May 28, 2013).

[11] "Think Different," Registration No. 2,707,257 (Apr. 15, 2003).

[12] "Just Do It," Registration No. 1,875,307 (Jan. 25, 1995).

[13] "Have It Your Way," Registration No. 0,961,016. (June 12, 1973)

[14] "EndTime Ministries," Registration No. 4,746,225 (June 2, 2015).

strange city knows about legal title to the land and build-
ings he passes" (emphasis deleted)).

   None of our government speech cases even remotely
supports the idea that registered trademarks are govern-
ment speech.   In *Johanns,* we considered advertisements
promoting the sale of beef products.   A federal statute
called for the creation of a program of paid advertising "'to
advance the image and desirability of beef and beef prod-
ucts.'"   544 U. S., at 561 (quoting 7 U. S. C. § 2902(13)).
Congress and the Secretary of Agriculture provided guide-
lines for the content of the ads, Department of Agriculture
officials attended the meetings at which the content of
specific ads was discussed, and the Secretary could edit or
reject any proposed ad.   544 U. S., at 561.   Noting that
"[t]he message set out in the beef promotions [was] from
beginning to end the message established by the Federal
Government," we held that the ads were government
speech.   *Id.*, at 560.   The Government's involvement in the
creation of these beef ads bears no resemblance to any-
thing that occurs when a trademark is registered.

   Our decision in *Summum* is similarly far afield.   A small
city park contained 15 monuments.   555 U. S., at 464.
Eleven had been donated by private groups, and one of
these displayed the Ten Commandments.   *Id.*, at 464–465.
A religious group claimed that the city, by accepting do-
nated monuments, had created a limited public forum for
private speech and was therefore obligated to place in the
park a monument expressing the group's religious beliefs.

   Holding that the monuments in the park represented
government speech, we cited many factors.   Governments
have used monuments to speak to the public since ancient
times; parks have traditionally been selective in accepting
and displaying donated monuments; parks would be over-
run if they were obligated to accept all monuments offered
by private groups; "[p]ublic parks are often closely identi-
fied in the public mind with the government unit that

owns the land"; and "[t]he monuments that are accepted . . . are meant to convey and have the effect of conveying a government message." *Id.*, at 472.

Trademarks share none of these characteristics. Trademarks have not traditionally been used to convey a Government message. With the exception of the enforcement of 15 U. S. C. §1052(a), the viewpoint expressed by a mark has not played a role in the decision whether to place it on the principal register. And there is no evidence that the public associates the contents of trademarks with the Federal Government.

This brings us to the case on which the Government relies most heavily, *Walker*, which likely marks the outer bounds of the government-speech doctrine. Holding that the messages on Texas specialty license plates are government speech, the *Walker* Court cited three factors distilled from *Summum*. 576 U. S., at \_\_\_–\_\_\_ (slip op., at 7–8). First, license plates have long been used by the States to convey state messages. *Id.*, at \_\_\_–\_\_\_ (slip op., at 9–10). Second, license plates "are often closely identified in the public mind" with the State, since they are manufactured and owned by the State, generally designed by the State, and serve as a form of "government ID." *Id.*, at \_\_\_ (slip op., at 10) (internal quotation marks omitted). Third, Texas "maintain[ed] direct control over the messages conveyed on its specialty plates." *Id.*, at \_\_\_ (slip op., at 11). As explained above, none of these factors are present in this case.

In sum, the federal registration of trademarks is vastly different from the beef ads in *Johanns*, the monuments in *Summum*, and even the specialty license plates in *Walker*. Holding that the registration of a trademark converts the mark into government speech would constitute a huge and dangerous extension of the government-speech doctrine. For if the registration of trademarks constituted government speech, other systems of government registration

could easily be characterized in the same way.

Perhaps the most worrisome implication of the Government's argument concerns the system of copyright registration. If federal registration makes a trademark government speech and thus eliminates all First Amendment protection, would the registration of the copyright for a book produce a similar transformation? See 808 F. 3d, at 1346 (explaining that if trademark registration amounts to government speech, "then copyright registration" which "has identical accoutrements" would "likewise amount to government speech").

The Government attempts to distinguish copyright on the ground that it is "'the engine of free expression,'" Brief for Petitioner 47 (quoting *Eldred* v. *Ashcroft*, 537 U. S. 186, 219 (2003)), but as this case illustrates, trademarks often have an expressive content. Companies spend huge amounts to create and publicize trademarks that convey a message. It is true that the necessary brevity of trademarks limits what they can say. But powerful messages can sometimes be conveyed in just a few words.

Trademarks are private, not government, speech.

## B

We next address the Government's argument that this case is governed by cases in which this Court has upheld the constitutionality of government programs that subsidized speech expressing a particular viewpoint. These cases implicate a notoriously tricky question of constitutional law. "[W]e have held that the Government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit.'" *Agency for Int'l Development* v. *Alliance for Open Society Int'l, Inc.*, 570 U. S. ___, ___ (2013) (slip op., at 8) (some internal quotation marks omitted). But at the same time, government is not required to subsidize activities that it does not wish to

promote. *Ibid.* Determining which of these principles applies in a particular case "is not always self-evident," *id.*, at \_\_\_ (slip op., at 11), but no difficult question is presented here.

Unlike the present case, the decisions on which the Government relies all involved cash subsidies or their equivalent. In *Rust* v. *Sullivan*, 500 U. S. 173 (1991), a federal law provided funds to private parties for family planning services. In *National Endowment for Arts* v. *Finley*, 524 U. S. 569 (1998), cash grants were awarded to artists. And federal funding for public libraries was at issue in *United States* v. *American Library Assn., Inc.*, 539 U.S. 194 (2003). In other cases, we have regarded tax benefits as comparable to cash subsidies. See *Regan* v. *Taxation With Representation of Wash.*, 461 U. S. 540 (1983); *Cammarano* v. *United States*, 358 U. S 498 (1959).

The federal registration of a trademark is nothing like the programs at issue in these cases. The PTO does not pay money to parties seeking registration of a mark. Quite the contrary is true: An applicant for registration must pay the PTO a filing fee of $225–$600. 37 CFR §2.6(a)(1). (Tam submitted a fee of $275 as part of his application to register THE SLANTS. App. 18.) And to maintain federal registration, the holder of a mark must pay a fee of $300–$500 every 10 years. §2.6(a)(5); see also 15 U. S. C. §1059(a). The Federal Circuit concluded that these fees have fully supported the registration system for the past 27 years. 808 F. 3d, at 1353.

The Government responds that registration provides valuable non-monetary benefits that "are directly traceable to the resources devoted by the federal government to examining, publishing, and issuing certificates of registration for those marks." Brief for Petitioner 27. But just about every government service requires the expenditure of government funds. This is true of services that benefit everyone, like police and fire protection, as well as services

that are utilized by only some, *e.g.*, the adjudication of private lawsuits and the use of public parks and highways.

Trademark registration is not the only government registration scheme. For example, the Federal Government registers copyrights and patents. State governments and their subdivisions register the title to real property and security interests; they issue driver's licenses, motor vehicle registrations, and hunting, fishing, and boating licenses or permits.

Cases like *Rust* and *Finley* are not instructive in analyzing the constitutionality of restrictions on speech imposed in connection with such services.

## C

Finally, the Government urges us to sustain the disparagement clause under a new doctrine that would apply to "government-program" cases. For the most part, this argument simply merges our government-speech cases and the previously discussed subsidy cases in an attempt to construct a broader doctrine that can be applied to the registration of trademarks. The only new element in this construct consists of two cases involving a public employer's collection of union dues from its employees. But those cases occupy a special area of First Amendment case law, and they are far removed from the registration of trademarks.

In *Davenport* v. *Washington Ed. Assn.*, 551 U. S. 177, 181–182 (2007), a Washington law permitted a public employer automatically to deduct from the wages of employees who chose not to join the union the portion of union dues used for activities related to collective bargaining. But unless these employees affirmatively consented, the law did not allow the employer to collect the portion of union dues that would be used in election activities. *Id.*, at 180–182. A public employee union argued that this law unconstitutionally restricted its speech based on its con-

tent; that is, the law permitted the employer to assist union speech on matters relating to collective bargaining but made it harder for the union to collect money to support its election activities. *Id.*, at 188. Upholding this law, we characterized it as imposing a "modest limitation" on an "extraordinary benefit," namely, taking money from the wages of non-union members and turning it over to the union free of charge. *Id.*, at 184. Refusing to confer an even greater benefit, we held, did not upset the marketplace of ideas and did not abridge the union's free speech rights. *Id.*, at 189–190.

*Ysursa* v. *Pocatello Ed. Assn.*, 555 U. S. 353 (2009), is similar. There, we considered an Idaho law that allowed public employees to elect to have union dues deducted from their wages but did not allow such a deduction for money remitted to the union's political action committee. *Id.*, at 355. We reasoned that the "the government . . . [was] not required to assist others in funding the expression of particular ideas." *Id.*, at 358; see also *id.*, at 355 ("The First Amendment . . . does not confer an affirmative right to use government payroll mechanisms for the purpose of obtaining funds for expression").

*Davenport* and *Ysursa* are akin to our subsidy cases. Although the laws at issue in *Davenport* and *Ysursa* did not provide cash subsidies to the unions, they conferred a very valuable benefit—the right to negotiate a collective-bargaining agreement under which non-members would be obligated to pay an agency fee that the public employer would collect and turn over to the union free of charge. As in the cash subsidy cases, the laws conferred this benefit because it was thought that this arrangement served important government interests. See *Abood* v. *Detroit Bd. of Ed.*, 431 U. S. 209, 224–226 (1977). But the challenged laws did not go further and provide convenient collection mechanisms for money to be used in political activities. In essence, the Washington and Idaho lawmakers chose to

confer a substantial non-cash benefit for the purpose of furthering activities that they particularly desired to promote but not to provide a similar benefit for the purpose of furthering other activities. Thus, *Davenport* and *Ysursa* are no more relevant for present purposes than the subsidy cases previously discussed.[15]

Potentially more analogous are cases in which a unit of government creates a limited public forum for private speech. See, *e.g.*, *Good News Club* v. *Milford Central School*, 533 U. S. 98, 106–107 (2001); *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 831 (1995); *Lamb's Chapel*, 508 U. S., at 392–393. See also *Legal Services Corporation* v. *Velazquez*, 531 U. S. 533, 541–544 (2001). When government creates such a forum, in either a literal or "metaphysical" sense, see *Rosenberger*, 515 U. S., at 830, some content- and speaker-based restrictions may be allowed, see *id.*, at 830–831. However, even in such cases, what we have termed "viewpoint discrimination" is forbidden. *Id.*, at 831.

Our cases use the term "viewpoint" discrimination in a broad sense, see *ibid.*, and in that sense, the disparagement clause discriminates on the bases of "viewpoint." To be sure, the clause evenhandedly prohibits disparagement of all groups. It applies equally to marks that damn Democrats and Republicans, capitalists and socialists, and those arrayed on both sides of every possible issue. It denies registration to any mark that is offensive to a substantial percentage of the members of any group. But in the sense relevant here, that is viewpoint discrimination: Giving offense is a viewpoint.

We have said time and again that "the public expression

---

[15] While these cases resemble subsidy cases insofar as the free speech rights of unions and their members are concerned, arrangements like those in these cases also implicate the free speech rights of non-union members. Our decision here has no bearing on that issue.

of ideas may not be prohibited merely because the ideas
are themselves offensive to some of their hearers." *Street*
v. *New York*, 394 U. S. 576, 592 (1969). See also *Texas* v.
*Johnson*, 491 U. S. 397, 414 (1989) ("If there is a bedrock
principle underlying the First Amendment, it is that the
government may not prohibit the expression of an idea
simply because society finds the idea itself offensive or
disagreeable"); *Hustler Magazine, Inc.* v. *Falwell*, 485 U. S.
46, 55–56 (1988); *Coates* v. *Cincinnati*, 402 U. S. 611, 615
(1971); *Bachellar* v. *Maryland*, 397 U. S. 564, 567 (1970);
*Tinker* v. *Des Moines Independent Community School
Dist.*, 393 U. S. 503, 509–514 (1969); *Cox* v. *Louisiana*, 379
U. S. 536, 551 (1965); *Edwards* v. *South Carolina*, 372 U. S.
229, 237–238 (1963); *Terminiello* v. *Chicago*, 337 U. S. 1,
4–5 (1949); *Cantwell* v. *Connecticut*, 310 U. S. 296, 311
(1940); *Schneider* v. *State (Town of Irvington)*, 308 U. S.
147, 161 (1939); *De Jonge* v. *Oregon*, 299 U. S. 353, 365
(1937).

For this reason, the disparagement clause cannot be
saved by analyzing it as a type of government program in
which some content- and speaker-based restrictions are
permitted.[16]

IV

Having concluded that the disparagement clause cannot
be sustained under our government-speech or subsidy
cases or under the Government's proposed "government-
program" doctrine, we must confront a dispute between
the parties on the question whether trademarks are com-
mercial speech and are thus subject to the relaxed scrutiny
outlined in *Central Hudson Gas & Elec. Corp.* v. *Public
Serv. Comm'n of N. Y.*, 447 U. S. 557 (1980). The Govern-
ment and *amici* supporting its position argue that all

———————
[16] We leave open the question whether this is the appropriate frame-
work for analyzing free speech challenges to provisions of the Lanham
Act.

trademarks are commercial speech. They note that the central purposes of trademarks are commercial and that federal law regulates trademarks to promote fair and orderly interstate commerce. Tam and his *amici*, on the other hand, contend that many, if not all, trademarks have an expressive component. In other words, these trademarks do not simply identify the source of a product or service but go on to say something more, either about the product or service or some broader issue. The trademark in this case illustrates this point. The name "The Slants" not only identifies the band but expresses a view about social issues.

We need not resolve this debate between the parties because the disparagement clause cannot withstand even *Central Hudson* review.[17] Under *Central Hudson*, a restriction of speech must serve "a substantial interest," and it must be "narrowly drawn." *Id.*, at 564–565 (internal quotation marks omitted). This means, among other things, that "[t]he regulatory technique may extend only as far as the interest it serves." *Id.*, at 565. The disparagement clause fails this requirement.

It is claimed that the disparagement clause serves two interests. The first is phrased in a variety of ways in the briefs. Echoing language in one of the opinions below, the Government asserts an interest in preventing "'underrepresented groups'" from being "'bombarded with demeaning messages in commercial advertising.'" Brief for Petitioner 48 (quoting 808 F. 3d, at 1364 (Dyk, J., concurring in part and dissenting in part)). An *amicus* supporting the Government refers to "encouraging racial

--------

[17] As with the framework discussed in Part III–C of this opinion, we leave open the question whether *Central Hudson* provides the appropriate test for deciding free speech challenges to provisions of the Lanham Act. And nothing in our decision should be read to speak to the validity of state unfair competition provisions or product libel laws that are not before us and differ from §1052(d)'s disparagement clause.

tolerance and protecting the privacy and welfare of individuals." Brief for Native American Organizations as *Amici Curiae* 21. But no matter how the point is phrased, its unmistakable thrust is this: The Government has an interest in preventing speech expressing ideas that offend. And, as we have explained, that idea strikes at the heart of the First Amendment. Speech that demeans on the basis of race, ethnicity, gender, religion, age, disability, or any other similar ground is hateful; but the proudest boast of our free speech jurisprudence is that we protect the freedom to express "the thought that we hate." *United States* v. *Schwimmer*, 279 U. S. 644, 655 (1929) (Holmes, J., dissenting).

The second interest asserted is protecting the orderly flow of commerce. See 808 F. 3d, at 1379–1381 (Reyna, J., dissenting); Brief for Petitioner 49; Brief for Native American Organizations as *Amicus Curiae* 18–21. Commerce, we are told, is disrupted by trademarks that "involv[e] disparagement of race, gender, ethnicity, national origin, religion, sexual orientation, and similar demographic classification." 808 F. 3d, at 1380–1381 (opinion of Reyna, J.). Such trademarks are analogized to discriminatory conduct, which has been recognized to have an adverse effect on commerce. See *ibid.*; Brief for Petitioner 49; Brief for Native American Organizations as *Amici Curiae* 18–20.

A simple answer to this argument is that the disparagement clause is not "narrowly drawn" to drive out trademarks that support invidious discrimination. The clause reaches any trademark that disparages *any person, group, or institution*. It applies to trademarks like the following: "Down with racists," "Down with sexists," "Down with homophobes." It is not an anti-discrimination clause; it is a happy-talk clause. In this way, it goes much further than is necessary to serve the interest asserted.

The clause is far too broad in other ways as well. The

clause protects every person living or dead as well as every institution.   Is it conceivable that commerce would be disrupted by a trademark saying: "James Buchanan was a disastrous president" or "Slavery is an evil institution"?

There is also a deeper problem with the argument that commercial speech may be cleansed of any expression likely to cause offense.   The commercial market is well stocked with merchandise that disparages prominent figures and groups, and the line between commercial and non-commercial speech is not always clear, as this case illustrates.   If affixing the commercial label permits the suppression of any speech that may lead to political or social "volatility," free speech would be endangered.

*     *     *

For these reasons, we hold that the disparagement clause violates the Free Speech Clause of the First Amendment.   The judgment of the Federal Circuit is affirmed.

*It is so ordered.*

JUSTICE GORSUCH took no part in the consideration or decision of this case.

1

# SUPREME COURT OF THE UNITED STATES

_____

No. 15–1293

_____

## JOSEPH MATAL, INTERIM DIRECTOR, UNITED STATES PATENT AND TRADEMARK OFFICE, PETITIONER *v.* SIMON SHIAO TAM

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

[June 19, 2017]

JUSTICE KENNEDY, with whom JUSTICE GINSBURG, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, concurring in part and concurring in the judgment.

The Patent and Trademark Office (PTO) has denied the substantial benefits of federal trademark registration to the mark THE SLANTS. The PTO did so under the mandate of the disparagement clause in 15 U. S. C. §1052(a), which prohibits the registration of marks that may "disparage . . . or bring . . . into contemp[t] or disrepute" any "persons, living or dead, institutions, beliefs, or national symbols."

As the Court is correct to hold, §1052(a) constitutes viewpoint discrimination—a form of speech suppression so potent that it must be subject to rigorous constitutional scrutiny. The Government's action and the statute on which it is based cannot survive this scrutiny.

The Court is correct in its judgment, and I join Parts I, II, and III–A of its opinion. This separate writing explains in greater detail why the First Amendment's protections against viewpoint discrimination apply to the trademark here. It submits further that the viewpoint discrimination rationale renders unnecessary any extended treatment of other questions raised by the parties.

## I

Those few categories of speech that the government can regulate or punish—for instance, fraud, defamation, or incitement—are well established within our constitutional tradition. See *United States* v. *Stevens*, 559 U. S. 460, 468 (2010). Aside from these and a few other narrow exceptions, it is a fundamental principle of the First Amendment that the government may not punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys. See *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 828–829 (1995).

The First Amendment guards against laws "targeted at specific subject matter," a form of speech suppression known as content based discrimination. *Reed* v. *Town of Gilbert,* 576 U. S. ___, ___ (2015) (slip op., at 12). This category includes a subtype of laws that go further, aimed at the suppression of "particular views . . . on a subject." *Rosenberger*, 515 U. S., at 829. A law found to discriminate based on viewpoint is an "egregious form of content discrimination," which is "presumptively unconstitutional." *Id.,* at 829–830.

At its most basic, the test for viewpoint discrimination is whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed. See *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.*, 473 U. S. 788, 806 (1985) ("[T]he government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject"). In the instant case, the disparagement clause the Government now seeks to implement and enforce identifies the relevant subject as "persons, living or dead, institutions, beliefs, or national symbols." 15 U. S. C. §1052(a). Within that category, an applicant may register a positive or benign mark but not a derogatory one. The law thus reflects the Government's disapproval of a subset of mes-

sages it finds offensive. This is the essence of viewpoint discrimination.

The Government disputes this conclusion. It argues, to begin with, that the law is viewpoint neutral because it applies in equal measure to any trademark that demeans or offends. This misses the point. A subject that is first defined by content and then regulated or censored by mandating only one sort of comment is not viewpoint neutral. To prohibit all sides from criticizing their opponents makes a law more viewpoint based, not less so. Cf. *Rosenberger, supra,* at 831–832 ("The . . . declaration that debate is not skewed so long as multiple voices are silenced is simply wrong; the debate is skewed in multiple ways"). The logic of the Government's rule is that a law would be viewpoint neutral even if it provided that public officials could be praised but not condemned. The First Amendment's viewpoint neutrality principle protects more than the right to identify with a particular side. It protects the right to create and present arguments for particular positions in particular ways, as the speaker chooses. By mandating positivity, the law here might silence dissent and distort the marketplace of ideas.

The Government next suggests that the statute is viewpoint neutral because the disparagement clause applies to trademarks regardless of the applicant's personal views or reasons for using the mark. Instead, registration is denied based on the expected reaction of the applicant's audience. In this way, the argument goes, it cannot be said that Government is acting with hostility toward a particular point of view. For example, the Government does not dispute that respondent seeks to use his mark in a positive way. Indeed, respondent endeavors to use The Slants to supplant a racial epithet, using new insights, musical talents, and wry humor to make it a badge of pride. Respondent's application was denied not because the Government thought his object was to demean or offend but

because the Government thought his trademark would have that effect on at least some Asian-Americans.

The Government may not insulate a law from charges of viewpoint discrimination by tying censorship to the reaction of the speaker's audience. The Court has suggested that viewpoint discrimination occurs when the government intends to suppress a speaker's beliefs, *Reed*, *supra*, at ___–___ (slip op., at 11–12), but viewpoint discrimination need not take that form in every instance. The danger of viewpoint discrimination is that the government is attempting to remove certain ideas or perspectives from a broader debate. That danger is all the greater if the ideas or perspectives are ones a particular audience might think offensive, at least at first hearing. An initial reaction may prompt further reflection, leading to a more reasoned, more tolerant position.

Indeed, a speech burden based on audience reactions is simply government hostility and intervention in a different guise. The speech is targeted, after all, based on the government's disapproval of the speaker's choice of message. And it is the government itself that is attempting in this case to decide whether the relevant audience would find the speech offensive. For reasons like these, the Court's cases have long prohibited the government from justifying a First Amendment burden by pointing to the offensiveness of the speech to be suppressed. See *ante*, at 23 (collecting examples).

The Government's argument in defense of the statute assumes that respondent's mark is a negative comment. In addressing that argument on its own terms, this opinion is not intended to imply that the Government's interpretation is accurate. From respondent's submissions, it is evident he would disagree that his mark means what the Government says it does. The trademark will have the effect, respondent urges, of reclaiming an offensive term for the positive purpose of celebrating all that Asian-

Americans can and do contribute to our diverse Nation. Brief for Respondent 1–4, 42–43. While thoughtful persons can agree or disagree with this approach, the dissonance between the trademark's potential to teach and the Government's insistence on its own, opposite, and negative interpretation confirms the constitutional vice of the statute.

## II

The parties dispute whether trademarks are commercial speech and whether trademark registration should be considered a federal subsidy. The former issue may turn on whether certain commercial concerns for the protection of trademarks might, as a general matter, be the basis for regulation. However that issue is resolved, the viewpoint based discrimination at issue here necessarily invokes heightened scrutiny.

"Commercial speech is no exception," the Court has explained, to the principle that the First Amendment "requires heightened scrutiny whenever the government creates a regulation of speech because of disagreement with the message it conveys." *Sorrell* v. *IMS Health Inc.*, 564 U. S. 552, 566 (2011) (internal quotation marks omitted). Unlike content based discrimination, discrimination based on viewpoint, including a regulation that targets speech for its offensiveness, remains of serious concern in the commercial context. See *Bolger* v. *Youngs Drug Products Corp.*, 463 U. S. 60, 65, 71–72 (1983).

To the extent trademarks qualify as commercial speech, they are an example of why that term or category does not serve as a blanket exemption from the First Amendment's requirement of viewpoint neutrality. Justice Holmes' reference to the "free trade in ideas" and the "power of . . . thought to get itself accepted in the competition of the market," *Abrams* v. *United States*, 250 U. S. 616, 630 (1919) (dissenting opinion), was a metaphor. In the realm

of trademarks, the metaphorical marketplace of ideas becomes a tangible, powerful reality. Here that real marketplace exists as a matter of state law and our common-law tradition, quite without regard to the Federal Government. See *ante,* at 2. These marks make up part of the expression of everyday life, as with the names of entertainment groups, broadcast networks, designer clothing, newspapers, automobiles, candy bars, toys, and so on. See Brief for Pro-Football, Inc., as *Amicus Curiae* 8 (collecting examples). Nonprofit organizations—ranging from medical-research charities and other humanitarian causes to political advocacy groups—also have trademarks, which they use to compete in a real economic sense for funding and other resources as they seek to persuade others to join their cause. See *id.,* at 8–9 (collecting examples). To permit viewpoint discrimination in this context is to permit Government censorship.

This case does not present the question of how other provisions of the Lanham Act should be analyzed under the First Amendment. It is well settled, for instance, that to the extent a trademark is confusing or misleading the law can protect consumers and trademark owners. See, *e.g., FTC* v. *Winstead Hosiery Co.*, 285 U. S. 483, 493 (1922) ("The labels in question are literally false, and . . . palpably so. All are, as the Commission found, calculated to deceive and do in fact deceive a substantial portion of the purchasing public"). This case also does not involve laws related to product labeling or otherwise designed to protect consumers. See *Sorrell*, *supra,* at 579 ("[T]he government's legitimate interest in protecting consumers from commercial harms explains why commercial speech can be subject to greater governmental regulation than noncommercial speech" (internal quotation marks omitted)). These considerations, however, do not alter the speech principles that bar the viewpoint discrimination embodied in the statutory provision at issue here.

It is telling that the Court's precedents have recognized just one narrow situation in which viewpoint discrimination is permissible: where the government itself is speaking or recruiting others to communicate a message on its behalf. See *Legal Services Corporation* v. *Velazquez*, 531 U. S. 533, 540–542 (2001); *Board of Regents of Univ. of Wis. System* v. *Southworth*, 529 U. S. 217, 229, 235 (2000); *Rosenberger*, 515 U. S., at 833. The exception is necessary to allow the government to stake out positions and pursue policies. See *Southworth*, *supra,* at 235; see also *ante,* at 13–14. But it is also narrow, to prevent the government from claiming that every government program is exempt from the First Amendment. These cases have identified a number of factors that, if present, suggest the government is speaking on its own behalf; but none are present here. See *ante,* at 14–18.

There may be situations where private speakers are selected for a government program to assist the government in advancing a particular message. That is not this case either. The central purpose of trademark registration is to facilitate source identification. To serve that broad purpose, the Government has provided the benefits of federal registration to millions of marks identifying every type of product and cause. Registered trademarks do so by means of a wide diversity of words, symbols, and messages. Whether a mark is disparaging bears no plausible relation to that goal. While defining the purpose and scope of a federal program for these purposes can be complex, see, *e.g., Agency for Int'l Development* v. *Alliance for Open Society Int'l, Inc.*, 570 U. S. \_\_\_, \_\_\_ (2013) (slip op., at 8), our cases are clear that viewpoint discrimination is not permitted where, as here, the Government "expends funds to encourage a diversity of views from private speakers," *Velazquez*, *supra*, at 542 (internal quotation marks omitted).

*      *      *

A law that can be directed against speech found offensive to some portion of the public can be turned against minority and dissenting views to the detriment of all. The First Amendment does not entrust that power to the government's benevolence. Instead, our reliance must be on the substantial safeguards of free and open discussion in a democratic society.

For these reasons, I join the Court's opinion in part and concur in the judgment.

# SUPREME COURT OF THE UNITED STATES

———————

No. 15–1293

———————

## JOSEPH MATAL, INTERIM DIRECTOR, UNITED STATES PATENT AND TRADEMARK OFFICE, PETITIONER *v.* SIMON SHIAO TAM

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

[June 19, 2017]

JUSTICE THOMAS, concurring in part and concurring in the judgment.

I join the opinion of JUSTICE ALITO, except for Part II. Respondent failed to present his statutory argument either to the Patent and Trademark Office or to the Court of Appeals, and we declined respondent's invitation to grant certiorari on this question. *Ante*, at 9. I see no reason to address this legal question in the first instance. See *Star Athletica, L. L. C.* v. *Varsity Brands, Inc.*, 580 U. S. \_\_\_, \_\_\_ (2017) (slip op., at 6).

I also write separately because "I continue to believe that when the government seeks to restrict truthful speech in order to suppress the ideas it conveys, strict scrutiny is appropriate, whether or not the speech in question may be characterized as 'commercial.'" *Lorillard Tobacco Co.* v. *Reilly*, 533 U. S. 525, 572 (2001) (THOMAS, J., concurring in part and concurring in judgment); see also, *e.g.*, *44 Liquormart, Inc.* v. *Rhode Island*, 517 U. S. 484, 518 (1996) (same). I nonetheless join Part IV of JUSTICE ALITO's opinion because it correctly concludes that the disparagement clause, 15 U. S. C. §1052(a), is unconstitutional even under the less stringent test announced in *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N. Y.*, 447 U. S. 557 (1980).